646 F.2d 1057
 107 L.R.R.M. (BNA) 2662, 91 Lab.Cas. P 12,794
 Robert B. LORD et al., Plaintiffs-Appellees-Cross Appellants,
v.
LOCAL UNION NO. 2088, INTERNATIONAL BROTHERHOOD OF
ELECTRICAL WORKERS, AFL-CIO and RCA International
Service Corporation,
Defendants-Appellants-Cross Appellees.
 No. 80-5010.
 United States Court of Appeals,
Fifth Circuit.
 
 Unit B
 June 4, 1981.
 Frank E. Hamilton, III, Hamilton & Douglas, Tampa, Fla., for Local union 2088.
 John P. McAdams and Peter W. Zinober, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, Fla., for RCA Intern.
 Plato E. Papps, Gen. Counsel, Washington, D. C., Joseph P. Manners and George H. Tucker, Miami, Fla., for intervenor Intern. Ass'n of Machinists and Aerospace Workers.
 David T. Bryant, Nat. Right to Work Legal Defense Foundation, Springfield, Va., Thomas C. Garwood, Jr. and Christopher A. Detzel, Orlando, Fla., for plaintiffs-appellees-cross appellants.
 Leo P. Rock, Jr., Orlando, Fla., for amicus curiae McDonnell Douglas.
 Appeals from the United States District Court for the Middle District of Florida.
 Before TUTTLE, RONEY and VANCE, Circuit Judges.
 VANCE, Circuit Judge:
 
 
 1
 This case presents the question whether the Florida right-to-work law[1] is applicable within federal enclaves over which the United States has exclusive jurisdiction. The district court held that such law is not applicable on Patrick Air Force Base, jurisdiction of which was ceded by Florida to the United States prior to the adoption of that state's right-to-work law, but is applicable at Cape Canaveral Air Force Station which was ceded to the United States after adoption of the Florida right-to-work law. We affirm as to Patrick Air Force Base and reverse as to Cape Canaveral.
 
 
 2
 Plaintiffs are present or former employees of defendant RCA International Service Corporation (RCA). They are employed within a collective bargaining unit, the certified representative for which is defendant Local Union No. 2088, International Brotherhood of Electrical Workers, AFL-CIO (the Union).
 
 
 3
 The bargaining unit includes RCA technical and plant clerical employees at a number of different installations in Brevard County, Florida including the Kennedy Space Center, the Cape Canaveral Air Force Station and Patrick Air Force Base. Within the bargaining unit there were a total of 147 employees. Of these, fifteen were assigned to the Kennedy Space Center, forty-four were assigned to Cape Canaveral Air Force Station and eighty-eight were assigned to Patrick Air Force Base. All but twelve of the 147 employees were members of the defendant Union.
 
 
 4
 The collective bargaining agreement between the Union and RCA applies to all employees within the unit and contains provisions whereby employees may exercise their seniority within seniority groups without distinction as to whether the job is at Kennedy Space Center, Cape Canaveral or Patrick Air Force Base.
 
 
 5
 On January 16, 1979 RCA and the Union amended the collective bargaining agreement to add a union shop provision which provided as follows:
 
 
 6
 Section 3.04. UNION SHOP. It shall be a condition of employment that all employees of the Company covered by this Agreement who are members of the Union in good standing on the effective or execution date of this Agreement, whichever is later, shall remain members in good standing and those who are not members on the effective or execution date of this Agreement, whichever is later, shall on the thirty-first (31st) day following the effective or execution date of this Agreement, whichever is later, become and remain members in good standing in the Union. It shall also be a condition of employment that all employees covered by this Agreement and hired on or after its effective or execution date, whichever is later, shall on the thirty-first (31st) day following the beginning of each employment, become and remain members in good standing of the Union.
 
 
 7
 Plaintiffs are not members of the Union. Pursuant to the amendment to the collective bargaining agreement they were notified by defendants that if they remained in the bargaining unit they would be required to join the Union or to pay the equivalent monthly dues to the Union commencing March 1, 1979 as a condition of continued employment. All of the plaintiffs who remained in the unit decided not to join the Union but elected to pay a sum equivalent to monthly dues. Each of the plaintiffs remaining in the unit has therefore paid the Union $16.00 a month since March, 1979. Notwithstanding the language of the agreement they have not and will not be required to become members of the Union.[2]
 
 
 8
 Plaintiffs brought this suit under Section 301 of The Labor Management Relations Act, 29 U.S.C. § 185, and the federal declaratory judgment statutes, 28 U.S.C. §§ 2201 and 2202, complaining that the agreement is prohibited by the constitution[3] and statutes[4] of the State of Florida (collectively referred to by the parties as the Florida right-to-work law). They sought declaratory and injunctive relief as well as reimbursement of monies paid to the Union pursuant to the agreement. The issue presented to the district court and to this court is a pure question of law. The parties have entered into a stipulation of facts and they have agreed that all facts required for the complete and final adjudication of the controversy are incorporated into that stipulation.
 
 
 9
 The controversy originally involved three locations including the Kennedy Space Center. All of the employees within the unit at the Kennedy Space Center were members of the Union and no plaintiff was employed at that facility. The district court found that the plaintiffs lacked standing to assert any claim concerning that location. The court's ruling in that respect was not appealed. As the controversy reaches this court it therefore involves enforcement of the collective bargaining agreement provisions only at Cape Canaveral Air Force Station and Patrick Air Force Base.
 
 
 10
 Under the Constitution the United States has the power to acquire land from the states for certain specified uses and to exercise exclusive jurisdiction over such lands, which are known as federal enclaves.[5] The jurisdiction exercised by the United States over federal enclaves is exclusive unless the deed of cession provides to the contrary or unless the cession is not accepted in the manner required by law. The parties do not dispute that both Patrick Air Force Base and Cape Canaveral Air Force Station are federal enclaves over which the United States has exclusive jurisdiction. The different treatment accorded to the two bases by the trial court is attributable to the time sequence involved in their cession to the United States and the adoption of the Florida right-to-work law. The following statement from the district court's memorandum decision correctly states the background to the present question:
 
 
 11
 (T)he federal law of every enclave includes state law which was in force at the time of the cession, where such state law is not inconsistent with federal law or policy. Pacific Coast Dairy, Inc. v. Department of Agriculture of California, 318 U.S. 285, 294 (63 S.Ct. 628, 630, 87 L.Ed. 761) (1943); James Stewart & Co. v. Sadrakula, 309 U.S. 94 (60 S.Ct. 431, 84 L.Ed. 596) (1940); Chicago, Rock Island and Pacific Railway Co. v. McGlinn, 114 U.S. 542 (5 S.Ct. 1005, 29 L.Ed. 270) (1885). This assures that no new federal enclave, regardless of size, will be left without laws. Mater v. Holley, (5th Cir.) 200 F.2d (123) at 124. However, laws of the state adopted after the cession are without any force or effect on the federal enclave. Pacific Coast Dairy, Inc. v. Department of Agriculture of California, 318 U.S. at 294 (63 S.Ct. at 630); Vincent v. General Dynamics Corp., D.C., 427 F.Supp. 786 at 794-95.
 
 
 12
 Lord v. Local Union No. 2088, 481 F.Supp. 419, 427 (M.D.Fla.1979).
 
 
 13
 Patrick Air Force Base was ceded to the United States prior to the 1944 amendment to the Florida constitution which added the right-to-work provision. The deeds of cession were dated in 1939 and 1940 and were accepted in 1940. Each of the deeds granted exclusive jurisdiction over the ceded land reserving only concurrent jurisdiction for service of civil and criminal process.[6]
 
 
 14
 Cape Canaveral Air Force Station, however, is located on land that was ceded to the United States by the State of Florida after the adoption of its right-to-work law. The deed of cession was signed and accepted in 1955 conveying exclusive jurisdiction over the ceded land also reserving only concurrent jurisdiction for service of civil and criminal process.
 
 
 15
 The district court reasoned therefore that Florida law could not be applied on Patrick Air Force Base but would apply on Cape Canaveral Air Force Station unless it conflicted with federal law or policy. In view of the provisions of section 14(b) of the National Labor Relations Act, 29 U.S.C. § 164(b), the district court concluded that there was no conflict and that the state's right-to-work law was applicable on Cape Canaveral Air Force Station. It is that ruling which RCA and the Union appeal.[7]
 
 
 16
 Under plaintiffs' reading of section 14(b) Florida was empowered to adopt a right-to-work law applicable to all federal enclaves geographically located within the confines of the state regardless of when they were ceded. On that basis they argue that the district court erred with respect to Patrick Air Force Base. The contention is before us on plaintiffs' cross-appeal.
 
 
 17
 The answer to two questions is determinative of both appeals: First, is there a conflict between the Florida right-to-work law and the law and policy of the United States? Second, does section 14(b) of the National Labor Relations Act grant power to the State of Florida to enact a right-to-work law that is applicable within a federal enclave?
 
 
 18
 Whether a conflict is perceived between federal and state law or policy depends to some degree on how the question is formulated. Plaintiffs urge that the question is whether the United States is for or against compulsory unionism. It concludes that it is neither, that the federal policy is one of benign neutrality. It urges that the neutrality of the United States does not conflict with Florida law.
 
 
 19
 We think that a more apt statement of the question is whether the union security agreement before use is or is not legal under the respective laws of the two sovereigns. Under Florida law, of course, it is not. Under the law of the United States, however, it clearly is legal. Section 8(a)(3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(3) provides:(N)othing in this subchapter, or in any other statute of the United States, shall preclude an employer from making an agreement with a labor organization to require as a condition of employment membership therein on or after the thirtieth day following the beginning of such employment or the effective date of such agreement, whichever is the later
 
 
 20
 This provision of the statute was revised in 1947. The legislative history makes unmistakably clear that although Congress outlawed the closed shop it intended that the National Labor Relations Act should continue to permit lesser forms of union security such as the union shop.[8] Section 8(a)(3) has been held to apply to agency shop as well as union shop agreements, and both are mandatory subjects of collective bargaining under federal labor policy. NLRB v. General Motors Corp., 373 U.S. 734, 83 S.Ct. 1453, 10 L.Ed.2d 670 (1963).
 
 
 21
 It seems clear to us that if the operative contract provision is expressly permitted under federal law and expressly prohibited under state law a conflict is presented. The Supreme Court recognized the conflict as such in Retail Clerks International Association, Local 1625 v. Schermerhorn, 375 U.S. 96, 84 S.Ct. 219, 11 L.Ed.2d 179 (1963) and again in Oil, Chemical & Atomic Workers v. Mobil Oil Corp., 426 U.S. 407, 96 S.Ct. 2140, 48 L.Ed.2d 736 (1976) (plurality opinion). In the more recent case the Court stated:
 
 
 22
 While § 8(a)(3) articulates a national policy that certain union-security agreements are valid as a matter of federal law, § 14(b) reflects Congress' decision that any State or Territory that wishes to may exempt itself from that policy. Section 14(b) allows a State or Territory to ban agreements "requiring membership in a labor organization as a condition of employment." We have recognized that with respect to those state laws which § 14(b) permits to be exempted from § 8(a)(3)'s national policy "(t)here is conflict between state and federal law; but it is a conflict sanctioned by Congress with directions to give the right of way to State laws "
 
 
 23
 Id. at 416-17, 96 S.Ct. at 2144-2145 (footnote omitted) (quoting Schermerhorn, 375 U.S. at 103, 84 S.Ct. at 222).
 
 
 24
 Lower courts have similarly recognized a conflict between right-to-work laws and federal policy. See, e. g., Vincent v. General Dynamics Corp., 427 F.Supp. 786, 796-800 (N.D.Tex.1977); King v. Gemini Food Services, Inc., 438 F.Supp. 964 (E.D.Va.1976), aff'd on the basis of the trial court opinion, 562 F.2d 297 (4th Cir. 1977), cert. denied, 434 U.S. 1065, 98 S.Ct. 1242, 55 L.Ed.2d 766 (1978). In King the court stated that the Virginia right-to-work law was not incorporated by the federal Assimilative Crimes Act (18 U.S.C. § 13) because "the policy of the Virginia statute conflicts with federal law Virginia law expressly prohibits union shop agreements while federal law expressly permits union shop agreements." 438 F.Supp. at 966. In the present case the district court expressly adopted the reasoning of King in concluding that Fla.Stat. § 447.14, which makes it a misdemeanor to violate the civil right-to-work statutes, did not apply to Cape Canaveral or Patrick under the Assimilative Crimes Act. The court stated that since union security agreements are not illegal under federal law, "it would be inconsistent and in conflict with such federal policy to apply a state law on a federal enclave which makes it a crime for an employer and a union to agree to such a union security clause." 481 F.Supp. at 430. The reasoning of the district court is sound: its only error in this case was its failure to apply this same reasoning to the application of the civil right-to-work statutes.
 
 
 25
 Since a conflict exists between section 8(a)(3) and state law, application of Florida law within a federal enclave is precluded unless, as plaintiffs argue, section 14(b) dictates otherwise. Section 14(b) states:
 
 
 26
 Nothing in this subchapter shall be construed as authorizing the execution or application of agreements requiring membership in a labor organization as a condition of employment in any State or Territory in which such execution or application is prohibited by State or Territorial law.
 
 
 27
 29 U.S.C. § 164(b).
 
 
 28
 Plaintiffs argue that this section resolves the conflict between Section 8(a) (3) and the Florida right-to-work law, giving "the right of way to State laws." Schermerhorn, 375 U.S. at 103, 84 S.Ct. at 222. Congress' direction in Section 14(b) "to give the right of way to State laws" extends, however, only to the area over which the state has power to legislate. The Supreme Court has made it clear that states retain no such power with regard to federal enclaves even though they are physically located within their territory. In United States v. State Tax Commission, 412 U.S. 363, 93 S.Ct. 2183, 37 L.Ed.2d 1 (1973), the Court held that even the sweeping powers granted to the states by the twenty-first amendment of the Constitution did not permit the State of Mississippi to enact price regulations on sales of liquor to military bases.
 
 
 29
 For our purposes here, it suffices to note that any legitimate state interest in regulating the importation into Mississippi of liquor purchased on the base by individuals cannot effect an extension of the State's territorial jurisdiction so as to permit it to regulate the distinct transactions that involve only the importation of liquor into the federal enclaves which "are to Mississippi as the territory of one of her sister states or a foreign land."
 
 
 30
 412 U.S. at 378, 93 S.Ct. at 2192 (citations omitted). It is apparent that while Section 14(b) gives the "right of way" to Florida law as to territory under Florida jurisdiction, it does not give Florida power to legislate over "federal enclaves which 'are to (Florida) as the territory of one of her sister states or a foreign land.' " See also Paul v. United States, 371 U.S. 245, 268, 83 S.Ct. 426, 439, 9 L.Ed.2d 292 (1963) where the Court stated, "Since a state may not legislate with respect to a federal enclave unless it reserved the right to do so when it gave its consent to the purchase by the United States, only state law existing at the time of the acquisition remains enforceable not subsequent laws."
 
 
 31
 Plaintiffs urge that Section 14(b) should be read as a delegation of power to the states to pass legislation applicable to federal enclaves. This contention finds no support whatever in the legislative history and was properly rejected by the district court. 481 F.Supp. at 429. "Because of the fundamental importance of the principles shielding federal installations and activities from regulation by the States, an authorization of state regulation is found only when and to the extent there is 'a clear congressional mandate,' 'specific congressional action' that makes this authorization of state regulation 'clear and unambiguous.' " Hancock v. Train, 426 U.S. 167, 179, 96 S.Ct. 2006, 2013, 48 L.Ed.2d 555 (1976) (footnotes omitted). Congress is not in the habit of ceding jurisdiction by implication. As examples cited by plaintiffs demonstrate, when Congress chooses to make state law applicable to federal enclaves it does so explicitly in a manner which permits no doubt or speculation.[9]
 
 
 32
 A more accurate characterization of Section 14(b) than that proposed by plaintiffs was stated in Retail Clerks International Association, Local 1625 v. Schermerhorn :
 
 
 33
 In other words, Congress undertook pervasive regulation of union-security agreements, raising in the minds of many whether it thereby preempted the field under the decision in Hill v. Florida, 325 U.S. 538, (65 S.Ct. 1373, 89 L.Ed. 1782), and put such agreements beyond state control. That is one reason why a section, which later became § 14(b), appeared in the House bill a provision described in the House Report as making clear and unambiguous the purpose of Congress not to preempt the field.
 
 
 34
 375 U.S. at 100-01, 84 S.Ct. at 221 (footnote omitted) (emphasis added). Our own review of the legislative history[10] underscores the correctness of the Supreme Court's description. The notion that in enacting Section 14(b) Congress may have somehow intended to adopt a special rule applicable to federal enclaves as it has expressly done when it has so intended is simply lacking in credible support. Plaintiffs' arguments are properly addressed to Congress. Absent congressional action we are constrained by established precedent to hold that because Florida law conflicts with federal law and policy with respect to the legality of the collective bargaining agreement now before us, it cannot be enforced within either federal enclave.
 
 
 35
 Summary judgment in favor of defendants as to the union security agreement applicable to employees at Patrick Air Force Base is AFFIRMED. Summary judgment in favor of plaintiffs as to the union security agreement applicable to employees at Cape Canaveral Air Force Station is REVERSED and the case REMANDED with directions that judgment be entered for defendants.
 
 
 36
 AFFIRMED in part, REVERSED and REMANDED in part with directions.
 
 
 37
 RONEY, Circuit Judge, concurring in part and dissenting in part:
 
 
 38
 I concur with the decision to affirm the summary judgment in favor of defendant as to the union security agreement applicable to employees at Patrick Air Force Base.
 
 
 39
 I dissent from the decision to reverse the summary judgment in favor of plaintiffs as to the union security agreement applicable to employees at Cape Canaveral Air Force Station. As to Cape Canaveral, I would affirm the summary judgment for the reasons given in Chief Judge George C. Young's opinion under the heading, B. The Union Security Agreement is Unenforceable on the Federal Enclave of Cape Canaveral Air Force Station. Lord v. Local Union No. 2088, 481 F.Supp. 419, 427-28 (M.D.Fla.1979).
 
 
 40
 In sum, I think the district court correctly held that "there is not a federal policy in favor of union security agreements," and that "the Florida right-to-work civil laws are not in conflict with any such federal law or policy," and therefore the Florida right-to-work laws "in effect at the time of deed of cession to the United States, and absent specific Congressional legislation to the contrary" are applicable on Cape Canaveral Air Force Station. 481 F.Supp. at 428.
 
 
 41
 I would affirm the district court in all respects.
 
 
 
 [1]
 References to such laws persist in reflecting a determined stylistic difference. Unions, including those before use, typically use quotation marks and lower case: "right-to-work law" or even "so-called, right-to-work law." Plaintiff's counsel from the National Right to Work Legal Defense Foundation, like many employers, uses upper case and no quotation marks. Complete impartiality might dictate that we refer only to "state statutes governing union security agreements." For convenience, however, we choose to employ the appellation right-to-work law without quotation marks and using lower case. In doing so we imply nothing and expressly decline to take sides in the ongoing psychological warfare
 
 
 [2]
 The parties to the agreement apparently treat the provision as creating an agency shop rather than a union shop
 
 
 [3]
 Fla.Const. Art. I, § 6 provides:
 The right of persons to work shall not be denied or abridged on account of membership or non-membership in any labor union or labor organization. The right of employees, by and through a labor organization, to bargain collectively shall not be denied or abridged. Public employees shall not have the right to strike.
 
 
 [4]
 Fla.Stat. § 447.03 provides:
 Employees shall have the right to self-organization, to form, join, or assist labor unions or labor organizations or to refrain from such activity, to bargain collectively through representatives of their own choosing, and to engage in concerted activities, for the purpose of collective bargaining or other mutual aid or protection.
 5 U.S.Const. Art. I, § 8, cl. 17 provides: "The Congress shall have Power To exercise exclusive Legislation in all Cases whatsoever over all Places purchased by the Consent of the Legislature of the State in which the Same shall be, for the Erection of Forts, Magazines, Arsenals, dock-Yards, and other needful Buildings "
 
 
 [6]
 Retention of jurisdiction for service of process does not alter the conclusion that the United States has acquired exclusive jurisdiction in all respects material to our present consideration. See United States v. State Tax Commission, 412 U.S. 363, 372, 93 S.Ct. 2183, 2189, 37 L.Ed.2d 1 (1973)
 
 
 [7]
 Appellants advance an alternative argument to the effect that the primary work situs of the unit as a whole (Patrick Air Force Base) rather than the work place of individual employees should control. In view of our holding, it is not necessary that we reach this question
 
 
 [8]
 In enacting § 8(a)(3) Congress provided safeguards for employees subject to union and agency shop agreements. Nevertheless, as the Supreme Court observed in Oil, Chemical and Atomic Workers v. Mobil Oil Corp., 426 U.S. 407, 416, 96 S.Ct. 2140, 2144, 48 L.Ed.2d 736 (1976), "Congress' decision to allow union-security agreements at all reflects its concern that, at least as a matter of federal law, the parties to a collective bargaining agreement be allowed to provide that there be no employees who are getting the benefits of union representation without paying for them." The Senate Committee Report discussing the revisions to § 8(a)(3) stated: "It seems to us that these amendments remedy the most serious abuses of compulsory union membership and yet give employers and unions who feel that such agreements promoted stability by eliminating 'free riders' the right to continue such arrangements." S.Rep.No. 105, 80th Cong., 1st Sess. 7 (1947). The House conference Report noted: "Both the House bill and the Senate amendment, in rewriting the present provisions of section 8(3) of the act, abolished the closed shop. The union shop and maintenance of membership, however, were permitted both under the house bill (sec. 8(d)(4) and under the Senate amendment (Proviso to sec. 8(a) (3)) Under the provisions of the conference agreement an employer is permitted to enter into (a union shop) agreement with a labor organization. H.Conf.R. 510, 80th Cong., 1st Sess. 41 (1947), U.S. Code Cong. & Admin. News 1947, pp. 1135, 1146. Thus, "As far as the federal law was concerned, all employees could be required to pay their way." NLRB v. General Motors Corp., 373 U.S. 734, 741, 83 S.Ct. 1453, 1458, 10 L.Ed.2d 670 (1963)
 
 
 [9]
 See, e. g., 4 U.S.C. § 104 et seq.; 10 U.S.C. § 2671. As the Supreme Court commented in rejecting a contention that Congress had by implication abandoned exclusive jurisdiction over a military enclave, "When Congress has wished to allow a State to exercise jurisdiction to levy certain taxes within a federal enclave it has specifically so stated, as in the Buck Act, 4 U.S.C. §§ 104-110." Humble Pipe Line Co v. Waggonner, 376 U.S. 369, 374, 84 S.Ct. 857, 860, 11 L.Ed.2d 782 (1964)
 
 
 [10]
 The legislative history indicates that Congress enacted section 14(b) solely to make clear that federal law did not preempt the field with regard to compulsory unionism. The House Report states: "Since by the Labor Act Congress preempts the field that the Act covers the committee has provided expressly that laws and constitutional provisions of any State that restrict the right of employers to require employees to become or remain members of labor organizations are valid, notwithstanding any provision of the National Labor Relations Act." H.Rep.No. 245, 80th Cong. 1st Sess. 44 (1947). The original Senate bill did not contain a counterpart to section 14(b) because the Senate believed that the legislative history of the original National Labor Relations Act "made clear that the proviso in section 8(3) was not intended to override State laws regulating the closed shop." S.Rep.No. 105, 80th Cong., 1st Sess. 6 (1947). For the sake of clarification, however, the Senate conferees agreed to the incorporation of section 14(b) into the Act. The House Conference Report reflects this compromise: "It was never the intention of the National Labor Relations Act, as disclosed by the legislative history of that Act, to preempt the field in this regard so as to deprive the States of their powers to prevent compulsory unionism To make certain that there should be no question about this, section 13 was included in the House bill. The Conference agreement, in section 14(b), contains a provision having the same effect."