**LOCAL 259, UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 1118, Docket 85–4019.

United States Court of Appeals, Second Circuit.

Argued May 2, 1985.

Decided Oct. 29, 1985.

24

Larry Magarik, New York City (Sipser, Weinstock, Harper, Dorn & Liebowitz, New York City, of counsel) for petitioner.

Christoper W. Young, Atty., N.L.R.B., Washington, D.C. (Kenneth B. Hipp, Deputy Asst. Gen. Counsel, Rosemary M. Collyer, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Washington, D.C., of counsel), for respondent.

William E. Fitzgerald, Manchester, Conn. (Stephen T. Penny, Manchester, Conn., on brief), for amicus curiae, Brady-Stannard Motor Co., Inc.

Before KAUFMAN, VAN GRAAFEILAND, Circuit Judges, and POLLACK, District Judge.[*]

VAN GRAAFEILAND, Circuit Judge:

Local 259, United Automobile, Aerospace and Agricultural Implement Workers of America (the "Union") petitions for review of a National Labor Relations Board order dismissing a complaint issued by NLRB's General Counsel charging violations by Brady-Stannard Motor Co., Inc. (the "employer") of sections 8(a)(1), (3) and (5) of the National Labor Relations Act, 29 U.S.C. §§ 158(a)(1), (3) and (5). For the reasons that follow, the petition is denied.

In 1979, the employer, an automobile dealership in Brewster, New York, entered into a three-year, union shop contract with the Union covering employees in its service shop. Among other things, the contract prescribed hourly wage rates for the employees involved. However, the earnings of the employer's mechanics could not be computed simply by referring to their hourly rate, because mechanics' earnings were calculated by multiplying their hourly rate by a set number of hours allocated to each task they performed, and this allocated time might vary substantially from the time actually devoted to the task. *See American Federation of Television and Radio Artists, Kansas City Local v. NLRB*, 395 F.2d 622, 624 n. 6 (D.C.Cir. 1968). In other words, a mechanic might earn more than eight hours pay in a day by performing his assigned tasks in less time than was allocated to them.

[*] Senior Judge of the United States District Court for the Southern District of New York, sitting by designation.

To complicate matters, time allocations were derived, not from a single source, but from three, the "Factory Book", the "Menu", and the "Chilton Book". The Factory Book set service times for work performed under manufacturers' warranties. The Menu was created by the employer and set service times for a limited number of common tasks such as engine tune-ups. The Chilton Book, a commercially published industry source, was used to calculate all other service times. In most instances, the Chilton Book allocated more time to given tasks than did the Factory Book. An expert witness testified that, for 90% of the tasks, the Chilton Book allocated 30% more time. The Menu allocations generally fell somewhere in between the Factory and the Chilton.

Because the employer was sustaining substantial losses in its service department, it undertook negotiations for a new contract in 1982 with several important goals in mind. One was the complete elimination of the Chilton Book as a source for time allocations. Another was the breaking down of mechanical work into classifications under which less skillful, and therefore lower paid, mechanics would perform work that was of a more menial nature. A third goal was the establishment of an hourly rate with which the employer could live.

The Union was of another mind. It asked for a 12½% increase in the hourly rate, retention of the Chilton Book and an increase in the guaranteed minimum work week from 35 to 40 hours. After six bargaining sessions, an impasse was reached. The employer's last offer prior to impasse was in the alternative; either a 6% increase in the hourly rate to $9.38, with time allocations based on the Factory Book or Menu and with no guaranteed weekly minimum, or the continuation of the terms of the expired contract for another year. Following rejection of both offers, seventeen service department employees, eight of whom were class A mechanics, went on strike.

Several weeks later, the employer began to hire replacements. Before any were hired, the employer had to make a business judgment. *See Vesuvius Crucible Co. v. NLRB*, 668 F.2d 162, 167–68 (3d Cir.1981). In the words of its General Manager, "we needed to hire [replacements] at a fair salary, but it had to be a fair rate of pay, but it had to be less than what we were paying our existing people." At the General Manager's request, the employer's bookkeeper analyzed the company records. She determined from them that, under the expired contract, the earnings of the striking class A mechanics had averaged out to $9.93 an hour. The employer then decided to offer replacement class A mechanics a guaranteed 35-hour week at an hourly rate of $9.75 calculated according to the Factory Book and the Menu. The employer also proceeded with its proposed plan to classify mechanics. It hired three class A replacements at the $9.75 hourly rate and three class B mechanics at an hourly rate of $7.00.

On November 3, 1982, the Union filed charges asserting that the employer had hired replacement employees "at a rate of pay higher than the rate it has offered the Union for the identical work by the regular employees." Thereafter, General Counsel issued a complaint on behalf of the Board alleging that the employer had paid mechanics and "B" part replacements hourly wages in excess of those offered during negotiations and had guaranteed mechanics a weekly minimum wage in excess of what it had offered during negotiations.

On April 25, 1983, the Union filed an amended charge asserting that, on or about February 15, 1983, the employer had refused to offer reinstatement to the striking employees despite their unconditional offer to return to work. An amended complaint incorporating this additional charge was issued on July 20, 1983.

During the hearing before Administrative Law Judge Pacht, counsel for the General Counsel withdrew the allegations of the complaint which referred to class "B" part replacements. It is not clear from the record whether General Counsel had confused class "B" parts employees with class

B mechanics. In any event, because the three class B mechanics, whom the employer hired, were being paid an hourly rate of only $7.00, the thrust of General Counsel's charges was against the earnings of the three class A replacements. The employer introduced proof, however, that, although the hourly wage of the class A replacements was more than the employer's highest offer, because of the elimination of the Chilton Book, the replacements' actual earnings were less than what the striking mechanics had earned.

The Administrative Law Judge felt that, although the employer's calculations were made in good faith, the conclusions reached were "imperfect and unreliable" and required a "leap of faith" to accept. However, she did not base her decision on a finding that they were erroneous. Instead, she framed her holding to accord with the allegations of General Counsel's complaint and based it on the stipulated facts that the employer was paying the three grade A mechanics a greater hourly wage rate and a higher minimum wage than was offered to the Union during negotiations. As a result, she held, the employees' economic strike was converted into an unfair labor practice strike.

The Board majority disagreed with the Administrative Law Judge's holding, because it found that the actual wages paid to the strike replacements were consistent with those offered the Union in the employer's final proposal. The Board felt that, because the mechanics' earnings could "vary significantly based on the number of tasks performed, and the number of hours allotted to a task for purposes of calculating wages," an analysis based only on an hourly rate and minimum guarantee was "superficial". The Board preferred to rely on the "clear facts which show that the replacements' actual wages were not higher than those offered the Union", *i.e.,* the wages earned under the prior contract which the employer had offered to renew. The Union now asks us to overturn the Board's order.

Our right of review is, of course, a limited one. The Board's findings of fact, when supported by substantial evidence on the record as a whole, are conclusive, and the Board's interpretation and application of the Act in doubtful situations are entitled to weight. *NLRB v. Denver Building & Construction Trades Council,* 341 U.S. 675, 691–92, 71 S.Ct. 943, 952–53, 95 L.Ed. 1284 (1951). When the Board's construction of the Act "is an acceptable reading of the statutory language and a reasonable interpretation of the purposes of the relevant statutory sections", its decision will not be overturned. *NLRB v. Local Union No. 103, International Association of Bridge, Structural & Ornamental Iron Workers,* 434 U.S. 335, 341, 350, 98 S.Ct. 651, 655, 660, 54 L.Ed.2d 586 (1978). "[E]ven as to matters not requiring expertise a court may [not] displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it *de novo*". *NLRB v. United Insurance Co. of America,* 390 U.S. 254, 260, 88 S.Ct. 988, 991, 19 L.Ed.2d 1083 (1968) (quoting *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951)).

We are satisfied at the outset that the Board's finding is supported by substantial evidence in the record as a whole. In addition to the earning figures compiled by the employer's bookkeeper, there is testimony by an expert witness that a mechanic employed at $9.75 an hour and using the Factory Book would not earn as much as a mechanic employed at $8.85 an hour but using the Chilton Book. Moreover, simple mathematical calculations, which the Union could have made prior to the start of the alleged unfair labor practice strike, show that this is so.

In 1981, the average annual earnings of the class A mechanics approximated $22,-000. Approximately 40% of this amount was paid under the Chilton Book, which, as pointed out above, allocated 30% more time than the Factory Book in 90% of the cases. This means that approximately $8,800 of

the $22,000 was earned under Chilton. Of this amount, 90%, or $7,920, was based on an allocation that was 30% higher than would have been allocated under the Factory Book. Accordingly, had the eight mechanics been working under the Factory Book, their average earnings for the pertinent 40% would have been approximately $6,090, almost $1,900 less than what they actually earned. Increasing their wages from $8.85 an hour to $9.75 an hour (approximately 10%) would have raised their earnings to approximately $6,700, which still would be some $1,200 less than what they actually earned.

▮ Congress has instructed this Court to review the decisions of the Board, not those of Administrative Law Judges. *Kopack v. NLRB*, 668 F.2d 946, 952 (7th Cir.), *cert. denied*, 456 U.S. 994, 102 S.Ct. 2278, 73 L.Ed.2d 1290 (1982); *NLRB v. Matouk Industries, Inc.*, 582 F.2d 125, 128 (1st Cir.1978); 29 U.S.C. § 160(e)(f). Nonetheless, an Administrative Law Judge's factual findings are part of the record and cannot be ignored. *Ewing v. NLRB*, 732 F.2d 1117, 1120 (2d Cir.1984). Where the Administrative Law Judge's findings are basic or evidentiary and hinge upon credibility determinations, the substantiality of the evidence to support inconsistent findings by the Board is more open to question than it otherwise might be. *Id.* at 1121. However, "[t]he significance of [an Administrative Law Judge's] report ... depends largely on the importance of credibility in the particular case", *Universal Camera Corp. v. NLRB, supra,* 340 U.S. at 496, 71 S.Ct. 456, 468, 95 L.Ed. 456, and no special deference need be given an Administrative Law Judge's inferences and conclusions that do not hinge upon findings of credibility. *See NLRB v. Steinerfilm, Inc.,* 669 F.2d 845, 849 n. 4 (1st Cir.1982); *NLRB v. Ridgeway Trucking Co.,* 622 F.2d 1222, 1224–25 (5th Cir.1980); *NLRB v. Matouk Industries, Inc., supra,* 582 F.2d at 128; *NLRB v. Lenkurt Electric Co.,* 438 F.2d 1102, 1105 n. 3 (9th Cir.1971); *Sign and Pictorial Union Local 1175 v. NLRB,* 419 F.2d 726, 733–34 (D.C.Cir.1969).

The failure of Administrative Law Judge Pacht to base her decision on the figures submitted by the employer was not predicated on a finding that the employer's witnesses lacked credibility. Indeed, Judge Pacht expressed her belief that the employer's bookkeeper made a "good faith effort" to compile the figures in question. The Judge simply did not take those figures into account in reaching her decision.

The Board, on the other hand, correctly determined that the best offer made by the employer was the renewal of the expired contract, and it found that the earnings of the replacement mechanics were reasonably comprehended within and not greater than the striking mechanics' earnings under that contract. This finding is supported by the record. Moreover, the Board did not disregard established precedent in making it.

In *O'Malley Lumber Co.,* 234 NLRB 1171 (1978), where the Board was faced with the question whether unilateral changes by an employer were "reasonably comprehended" within the proposals that were made, it said, quoting *West Coast Casket Co.,* 192 NLRB 624, 636 (1971), *enforced in pertinent part,* 469 F.2d 871 (9th Cir.1972):

> In determining whether an employer has bargained in good faith, it is necessary to scrutinize the totality of its conduct. From the context of an employer's total conduct, it must be decided whether the employer is lawfully engaging in hard bargaining to achieve a contract that it considers desirable or is unlawfully endeavoring to frustrate the possibility of arriving at any agreement.

*Id.* at 1179.

*See also Taylor-Winfield Corp.,* 225 NLRB 457 (1976), where the Board held that a proposed new pension plan under which 30% of the employees would receive less benefits did not violate § 8(a)(5), because other benefits might make up for it. "Overall", said the Board, "the proposed plan does not, as alleged in the complaint, have 'less value with respect to employee

retirement income than the [present plan]' ". *Id.* at 462.

Our review also must be based on the totality of circumstances involved. *Glaziers' Local No. 558 v. NLRB*, 408 F.2d 197, 201 (D.C.Cir.1969). Viewed in that manner, the instant case is not unlike *Excavation-Construction, Inc. v. NLRB*, 660 F.2d 1015 (4th Cir.1981), where the employer, which had been paying striking employees $8.30 per hour plus $.84 in pension and hospital benefits, paid a straight $9.14 per hour to replacements, and the Court held that this did not constitute an unlawful wage increase. *See also NLRB v. Southern Florida Hotel and Motel Association*, 751 F.2d 1571, 1582–83 (11th Cir.1985); *United Steelworkers of America, Local 5571 v. NLRB*, 401 F.2d 434, 438 (D.C.Cir. 1968), *cert. denied*, 395 U.S. 946, 89 S.Ct. 2020, 23 L.Ed.2d 465 (1969); *American Federation of Television and Radio Artists, Kansas City Local v. NLRB, supra*, 395 F.2d at 629–30; *NLRB v. Almeida Bus Lines, Inc.*, 333 F.2d 729, 734–35 (1st Cir. 1964). Although we do not accept the Union's contention that the Board departed from established precedent in reaching its decision, we note in passing that this would not necessarily be fatal to its determination. *See NLRB v. J. Weingarten, Inc.*, 420 U.S. 251, 264–68, 95 S.Ct. 959, 967–69, 43 L.Ed.2d 171 (1975); *NLRB v. Bartlett-Collins Co.*, 639 F.2d 652, 657–58 (10th Cir.), *cert. denied*, 452 U.S. 961, 101 S.Ct. 3109, 69 L.Ed.2d 971 (1981).

When the employer's conduct is viewed in its totality, there is substantial evidence that its wage offers to replacement workers were not substantially different from, or greater than, those which the employer had proposed during its negotiations with the Union. *NLRB v. Crompton-Highland Mills, Inc.*, 337 U.S. 217, 225, 69 S.Ct. 960, 964, 93 L.Ed. 1320 (1949). The Board therefore acted well within its power in finding no unlawful refusal to bargain.[1]

We need spend little time with the Union's challenge to the Board's holding that the employer was guilty of neither coercion or restraint, § 8(a)(1), nor discrimination, § 8(a)(3). As already pointed out, the employer's 1979–82 contract was a union shop contract, which contained the standard union security provision requiring employees to join the union thirty days after the start of employment. *See Lord v. Local Union No. 2088, International Brotherhood of Electrical Workers*, 646 F.2d 1057, 1058 (5th Cir.1981), *cert. denied*, 458 U.S. 1106, 102 S.Ct. 3483, 73 L.Ed.2d 1366 (1982). As the Union and its members well knew, the employer was willing to incorporate this provision in the new contract. Because motivation is a crucial issue under both sections 8(a)(1) and 8(a)(3), *American Ship Building Co. v. NLRB*, 380 U.S. 300, 308–13, 85 S.Ct. 955, 962–64, 13 L.Ed.2d 855 (1965); *B.G. Costich & Sons, Inc. v. NLRB*, 613 F.2d 450, 454–55 (2d Cir.1980), it is significant that the Administrative Law Judge found that the record demonstrated neither antiunion animus nor bad faith on the part of the employer. Although in some cases the Board "may", not "must", draw an inference of improper motivation from the challenged conduct itself, no inquiry into motivation is necessary unless the conduct, unlike that of the employer herein, is first found to have been improper. *B.G. Costich & Sons, Inc. v. NLRB, supra*, 613 F.2d at 455. Moreover, an inference of improper motivation does not comport with a finding which specifically negates antiunion animus and bad faith. *NLRB v. Island Typographers, Inc.*, 705 F.2d 44, 52–53 (2d Cir.1983); *NLRB v. Wells Fargo Armored Service Corp.*, 597 F.2d 7, 10–11 (1st Cir.1979).

Because the differences between the Administrative Law Judge and the Board did not result from a divergence of views as to the credibility of testimony concerning evidentiary facts but were

---

1. The ALJ ordered the employer, a small business in precarious financial circumstances, to rehire eight striking mechanics and to pay them back wages. The Board obviously felt, however, that the employer should not be required to pay striking employees more for not working that it paid their replacements for working.

based instead upon a difference in overall judgment as to the proper inferences and ultimate determination to be made from the largely undisputed facts, we conclude that the Board's order, which has substantial support in the record, must stand. *See American Federation of Television and Radio Artists, Kansas City Local v. NLRB, supra,* 395 F.2d at 628–29.

 Once the Board determined that the Union's economic strike was not transformed into an unfair labor practice strike, dismissal of the additional charge incorporated in the amended complaint followed as a matter of course. The law is well-settled that economic strikers whose positions have been filled by permanent replacements are not entitled to reinstatement upon demand. *NLRB v. Fleetwood Trailer Co.,* 389 U.S. 375, 379, 88 S.Ct. 543, 546, 19 L.Ed.2d 614 (1967).

Petition denied.

IRVING R. KAUFMAN, Circuit Judge (dissenting):

Professor Llewellyn has noted that "even an appellate court officially concerned with rules alone has been known repeatedly to strain itself and to strain the rules that it laid down in order to produce what seemed a just result in the case at hand." K. Llewellyn, *The Bramble Bush* 39 (1960). The majority opinion articulates the factual basis for its conclusion. A struggling employer acted in good faith and made a fair offer, but the Union "was of another mind." Ergo, the majority concludes the employer should not be punished. In reaching this result, however, my colleagues ignore firmly established tenets of labor law. Accordingly, I respectfully dissent.

In *NLRB v. Crompton-Highland Mills, Inc.,* 337 U.S. 217, 225, 69 S.Ct. 960, 964, 93 L.Ed. 1320 (1949), the Supreme Court held it an unfair labor practice for an employer unilaterally to offer terms "substantially different from, or greater than" those offered in negotiations with the authorized representative. The Court subsequently strengthened this rule by making any dis-

parate offer a *per se* violation of § 8(a)(5), regardless of the employer's good faith. *NLRB v. Katz,* 369 U.S. 736, 742–43, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962).

As the administrative law judge found, it takes a "leap of faith" to view the offer given to the replacement workers as comprehended within Brady-Stannard's highest final offer to its own employees. The hourly wage of $9.75 was an increase of 4.2%, and the guarantee constituted a substantial gain of 10.2%. Moreover, the Union might have agreed to eliminate the Chilton Book in exchange for the higher rate and guarantee. Administrative Law Judge Pacht found without contravention that the parties bargained over the guarantee as a separate item. Admittedly, however, the Union's response must be left to the realm of conjecture, for the employer never presented this package at the bargaining table.

To prove the replacement terms were less attractive than those contained in the current contract, the majority now proffers a pat mathematical calculation. Because the earnings could "vary significantly," the Board specifically declined to predicate its decision on the terms of "the formula used for determining wages." Rather, the Board expressly adopted the employer's *post hoc* standard. The replacements' compensation, reasoned the Board, was comprehended within the final offer because the new workers in fact earned less over a six month period. Local 259, of course, would have compared the surface attractiveness of the new compensation scheme with the loss of the Chilton Book benefits. Blessed with the clarity of hindsight, the Board has seen fit to override the administrative law judge and to declare the unilateral terms less attractive.

After-the-fact approbation cannot be squared with judicial enforcement of a duty to bargain in good faith. The mandate of § 8(a)(5) was never intended to obtain just results or blunt the economic weapons of the parties, but to insure the recognition of the authorized representative. *See* Cox,

*The Duty to Bargain in Good Faith*, 71 Harv.L.Rev. 1401 (1958). All that was required of the employer was that it submit its latest offer to the bargaining agent. If rejected, Brady-Stannard would have been free to implement it unilaterally. By allowing the employer to juggle the various elements of compensation, however, the Board in effect authorizes an employer to bypass the Union. The Board's decision therefore condones management behavior akin to the "take-it-or-leave-it" approach eschewed by this Court in *NLRB v. General Electric Co.*, 418 F.2d 736 (2d Cir.1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970).

*Post hoc* justification metamorphosizes the stringent legal standard of *Katz* into a nebulous factual determination. Although I do not question Brady-Stannard's good faith, this approach will inevitably benefit unscrupulous employers determined to shunt aside the authorized representative. However alluring the terms offered to new workers, employers can now hope the Board will, for whatever reason, later find them acceptable, even in the face of an adverse ruling by the administrative law judge. Indeed, the possible dangers are clear in this case. The Board concluded the replacement workers earned less *"because* the number of hours paid was no longer calculated on the Chilton Book." (emphasis added) This conclusion is highly suspect. As the administrative law judge noted, numerous other factors could have accounted for the decrease, such as a dip in business and the unfamiliarity of the new workers with the shop. Nonetheless, the Board's determination is protected by the stringent standards of review accorded its decisions.

The true *ratio decidendi* of this case is relegated to the footnote. Rather than bestow on the strikers the perceived windfall of backpay and reinstatement, my colleagues deny an unfair labor practice occurred at all. Like Administrative Law Judge Pacht and dissenting Board Member Dennis, I believe the resulting rule of decision is antithetical to enforcement of a duty to bargain. We must all subordinate our personal views on labor relations if we are to maintain the importance the law attaches to the bargaining process. Accordingly, I would grant Local 259's petition.