**YELLOW FREIGHT SYSTEMS, INC., Petitioner,**

v.

**Robert B. REICH, Secretary of Labor, and John A. Thom, Respondents.**

**Docket No. 94–4006.**

United States Court of Appeals, Second Circuit.

Argued June 30, 1994.

Decided Oct. 14, 1994.

Roger K. Quillen, Atlanta, GA (Michael C. Towers, Anderson B. Scott, Fisher & Phillips, of counsel), for petitioner.

Ronald Gottlieb, Washington, DC (U.S. Dept. of Labor, Thomas S. Williamson, Jr., Sol. of Labor, Joseph M. Woodward, Associate Sol. for Occupational Safety and Health, and Barbara Werthmann, Counsel for Appellate Litigation, of counsel), for respondents.

Before: KEARSE and ALTIMARI, Circuit Judges and SCHWARTZ, District Judge.[*]

SCHWARTZ, District Judge:

The issue presented on this appeal is whether the Secretary of Labor ("the Secretary") properly found that Yellow Freight Systems, Inc. discharged John Thom because he engaged in activity protected under § 405(b) of the Surface Transportation Assistance Act of 1982 ("the Act" or "the STAA"), 49 U.S.C.App. § 2305 (1988).[1] For the rea-

---

[*] The Honorable Allen G. Schwartz, United States District Judge for the Southern District of New York, sitting by designation.

**1.** In relevant part, § 405(b) of the Act prohibits discrimination against an employee for "refusing to operate a vehicle when such operation constitutes a violation" of any Federal commercial motor vehicle regulation (the "when" clause of the Act), or "because of the employee's reasonable apprehension of serious injury to himself or

sons set for below, we affirm the Secretary's finding.

## BACKGROUND

At 7:30 p.m. on March 30, 1992 ("March 30"), John Thom reported to work at the Buffalo terminal of Yellow Freight, a large interstate trucking firm for whom Thom had driven over-the-road commercial vehicles since November 1987. Thom was scheduled to undertake two driving assignments that evening. The first trip consisted of driving a city tractor[2] from the Buffalo terminal to Batavia, New York. Thom completed this trip without incident. Upon his return to Buffalo, Thom was assigned to city tractor No. 76380 ("the tractor") for his second trip, namely, the hauling of two loaded trailers, which weighed a combined total of 40,631 pounds, to Rochester, New York. This trip is 71 miles, primarily involving travel on interstate highway I–290.

Almost immediately after leaving the Buffalo terminal, Thom noticed that the tractor appeared to lack power. He continued the trip under the assumption that once he reached the interstate, the truck would be able to obtain the prevailing speed. Upon reaching the interstate, however, the tractor continued to exhibit a lack of power. The tractor could attain a maximum speed of 50 mph on a slight decline, 45 mph on flat surfaces, and 35 mph on a slight incline. Shortly thereafter, approximately four miles from the Buffalo terminal, Thom pulled off I–290 to report the problem.

Thom called the Buffalo terminal, and spoke to dispatcher Bill Swistak. Thom informed Swistak that the tractor was failing to maintain speed and that he, Thom, thought the tractor had a "fuel problem." Swistak instructed Thom to continue with the trip, but Thom refused on the grounds that it would be unsafe to do so. Swistak then referred the call to the head dispatcher, Mike Pross. Thom repeated his report to Pross, stating that the tractor was unable to reach speeds appropriate for highway driving and suggesting that a defect in the fuel system might lie at the root of the problem. Thom also expressed the concern that the tractor would not be able to go up the inclines which remained on the trip, some of which were of steeper grades than the incline on which the tractor's speed had dropped to 35 mph. He requested permission to bring the tractor back to the terminal, or for Yellow Freight to send someone out to examine the tractor.

Pross instructed Thom to continue the trip. With respect to the issue of the remaining inclines on I–290, Pross advised Thom that, "when you encounter one of these hills, if the tractor doesn't pull these hills, contact us, more or less we'll cross that bridge when we come to it." Thom refused to continue the trip, citing safety concerns. Pross then relieved Thom of duty, sent another driver to complete the trip, and wrote up a report of his conversation with Thom for Yellow Freight supervisor Joseph T. Lombardo.

Brad Mergenhagen replaced Thom and continued the trip to Rochester with Unit 76380. Upon reaching I–290 he also noticed that the tractor was exhibiting difficulty in reaching the appropriate speed on the highway, and further observed that large

the public due to the unsafe condition" of a vehicle (the "because" clause). The Act further provides that if an employee refuses to drive, citing safety concerns, the "because" clause offers protection only if "a reasonable person, under the circumstances then confronting the employee, would conclude that there is a bona fide danger of an accident, injury, or serious impairment of health, resulting from the unsafe condition." 49 U.S.C.App. § 2305(b). Further, to qualify for protection under the "because" clause in this action, an employee "must have sought from his employer, and have been unable to obtain, correction of the unsafe condition." *Id.*

**2.** Yellow Freight uses two types of tractors in its trucking operation, over-the-road tractors and city tractors. The over-the-road tractors have more horsepower than city tractors and, at Yellow Freight, possess a greater number of amenities (e.g., air-conditioned cabs, special seats, and CB radio) than city tractors. By agreement with the Teamsters Union, of which Thom is a member, Yellow Freight limits the use of city tractors to local trips and for over-the-road trips of under 300 miles round trip. Yellow Freight drivers generally prefer over-the-road tractors to city units, and complained with some frequency about the city units. Thom had filed three such complaints prior to March 30, 1992, citing the lack of air ride seats, air-conditioning, and outlets for CB radios in the city tractors.

amounts of smoke were pouring from the exhaust. A short time later, he stopped at a service plaza and reported the problem to the dispatcher then on duty at Yellow Freight's Buffalo terminal, suggesting that the tractor might have a plugged fuel injector or a vacuum in the fuel line. The dispatcher directed Mergenhagen to complete the trip, to which Mergenhagen replied that he would do so but would not accept responsibility for any resulting damage to the tractor's engine. He completed the remainder of the trip without incident.

Thom filled out a "Driver's Vehicle Inspection Report," noting therein Unit 76380's loss of power. On March 31, 1992, Lombardo instructed Yellow Freight's maintenance manager, David Kray, to conduct a thorough mechanic examination of the tractor, explaining to Mr. Kray only that there had been "a complaint of no power." Mechanic Chuck Pastor interpreted this command to require an examination of the tractor's fuel and power plant system, and subsequently certified on the Driver's Vehicle Inspection Report that the "[a]bove defects have been corrected." At Lombardo's direction, Pastor completed an additional worksheet, on which he indicated that he had evaluated Unit 76380 and "found nothing wrong." Lombardo also arranged for a road test on the stretch of I–290 where Thom had reported experiencing problems. The tractor reached a maximum speed of 57 mph and never fell below 40 mph during the test.

In light of the post-incident inspection of the tractor, Lombardo decided to discharge Thom.[3] He later testified that if the post-incident evaluation of Unit 76380 had revealed an actual safety defect, Yellow Freight would have paid him for the entire trip and would not have discharged him.

### Procedural History of This Action

Following his discharge, Thom filed a complaint under the STAA the Occupational Safety and Health Administration ("OSHA"). OSHA concluded, after a preliminary investigation, that Yellow Freight had not violated § 405 of the Act. Thom objected to this finding, and the matter was referred to an Administrative Law Judge (ALJ) for a hearing.

At the proceeding before the ALJ, Thom contended that § 405(b) protected his refusal to drive on March 30 under both its "when" and "because" clauses. According to Thom, the "when" clause applied to his conduct because continued operation of Unit 76380 on March 30 would have violated Department of Transportation regulation, 49 C.F.R. § 396.7.[4] Thom argued that the "because" clause also protected his refusal because his belief that the truck was unsafe to drive was objectively reasonable under the circumstances that confronted him on March 30.

At the hearing before the ALJ, testimony consisting of witnesses' accounts of the events of March 30, as well as testimony regarding the dangers posed by a tractor traveling at slow speeds was presented. Thom, and fellow Yellow Freight drivers Joseph Delmonte and John Newton, testified as to the risk of being rear-ended when a truck is unable to maintain the prevailing speed on a highway. Thom and Delmonte also testified that low speeds, in combination with the sensitive power-steering system on city tractors, causes trailers to "wiggle" more than normal, potentially causing interference with vehicles traveling in other lanes and, in extreme circumstances, resulting in the tractor "throwing" a trailer. Thom and Delmonte testified further that the stretch of I–290

---

3. Thom was at the final warning stage of his tenure with Yellow Freight. Specifically, he had recently served a 36 day suspension, imposed because he had failed to report to work upon receiving an assignment. Yellow Freight had originally attempted to discharge Thom for this offense, but agreed to reduce the penalty to a suspension (which included an agreement by Thom to undergo substance abuse rehabilitation) after Thom pursued the grievance procedure contained in the collective bargaining agreement. The letter authorizing his return to work, effec-

tive February 19, 1992, noted that he would be subject to discharge for any future incidents.

4. This regulation provides in pertinent part that:

Any motor vehicle discovered to be in an unsafe condition while being operated on the highway may be continued in operation only to the nearest place where repairs can be safely effected. Such operation shall be conducted only if it is less hazardous to the public than to permit the vehicle to remain on the highway.

which remained between Rochester and the point where Thom stopped driving on March 30 contained ruts, imposed by highway construction, that could exacerbate this "wiggle" effect. Yellow Freight's safety administrator testified in rebuttal, noting that no Yellow Freight tractor had, to his knowledge, caused any accidents by traveling too slowly and denying that the "wiggle" effect constituted a real safety hazard.

The ALJ also heard testimony regarding the condition of Unit 76380 on and prior to March 30. Yellow Freight mechanic Richard L. Veihdoffer testified that in the two weeks preceding March 30, 1992, he had received periodic write-ups for lack of power involving Unit 76380. The ALJ received into evidence Mergenhagen's statement that he (Mergenhagen) had noted a problem achieving speed as he completed Thom's trip and that he observed smoke pouring from the exhaust pipe of Unit 76380 during that time. Finally, Yellow Freight driver Gerald King testified that on November 7, 1991, Unit 76380 experienced a significant loss of power, failing to exceed 41 mph on the trip from Buffalo to Rochester.

The ALJ decided in favor of Thom, finding that his refusal was protected under the "because" clause. More precisely, the ALJ found that Thom's belief that an "unsafe condition" existed involving Unit 76380 was reasonable because "operating a tractor pulling two trailers with reduced power so that the maximum speed achieved on a slight incline was thirty-five miles per hour, while knowing that the trip includes hills with a steeper grade would cause a driver to be reasonably apprehensive of serious injury to himself, or the public." ALJ Dec. 8–9. The ALJ further held that Thom had met the statutory requirement of seeking, and being unable to obtain, correction of the unsafe condition before refusing to drive. Id. at 13. Consequently, the ALJ found that Yellow Freight had violated the Act by discharging Thom for his protected refusal to drive.[5] Yellow Freight appealed this decision to the Secretary.

The Secretary affirmed the ALJ's finding that Thom had demonstrated a violation of the "because" clause. As a threshold matter, the Secretary affirmed the ALJ's conclusion that the "because" clause does not, as Yellow Freight had contended before the ALJ, require complainant to prove that a safety defect actually existed at the time of the refusal to drive. Rather, the Secretary agreed with the ALJ that the clause should be "construed broadly" such that the reviewing court determines whether the driver's refusal to drive was objectively reasonable in light of the information regarding the perceived "unsafe condition" available to the driver at the time. Secretary's Final Decision and Order ("FD & O") at 6–7. In finding that substantial evidence supported the ALJ's finding that Thom's refusal to drive was protected activity under the foregoing standard, the Secretary noted that: (1) The ALJ had credited Thom's testimony that Unit 76380 had failed to maintain speed on March 30, id. at 4; (2) Thom's testimony regarding the loss of power was supported by both the testimony of King and Veihdoffer, which highlighted Unit 76380's history of power problems, and the statement of Mergenhagen, which confirmed the symptoms of power loss and a fuel system problem, id.; and (3) the results of Yellow Freight's post-incident inspection should be accorded little weight because mechanic Pastor did not testify at the hearing and "the record is silent as to any adjustments he may have made." Id. at 5. The Secretary also adopted the ALJ's finding that Thom had sought from Yellow Freight, and was unable to obtain, correction of the condition. Id. at 7. Accordingly, the Secretary ordered Yellow Freight to reinstate Thom, to pay him back wages, to reimburse him for lost benefits, and to pay limited compensatory damages and attorneys' fees. Id. at 7–8. Finally, the Secretary declined to reach the question of whether Thom's refusal to drive was protected by the "when" clause.

## DISCUSSION

### Standard of Review

 Under § 405(d) of the STAA, the Secretary's legal conclusions must be af-

---

5. The ALJ concluded, however, that the "when" clause did not protect Thom's conduct, reasoning from prior precedent involving the Secretary that to trigger the "when" clause, an employee must prove that a safety defect actually existed at the time of the refusal to drive.

firmed unless they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," and his findings of fact must be sustained unless they are "unsupported by substantial evidence" in the record considered as a whole. *See* 5 U.S.C. § 706(2) (1988). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (internal quotations omitted). In reviewing the Secretary's decision, the Court must accord deference to the Secretary's reasonable construction of a statute he administers. *Rust v. Sullivan,* 500 U.S. 173, 184, 111 S.Ct. 1759, 1767–68, 114 L.Ed.2d 233 (1991).

Petitioner argues that any credibility determinations that the Secretary made about witnesses based on the written record of the trial before the ALJ merit less deference than those made by the ALJ, who had the opportunity to observe the witnesses' demeanor. *NLRB v. Cooper Union For The Advancement of Science,* 783 F.2d 29, 31, n. 2 (2d Cir.), *cert. denied,* 479 U.S. 815, 107 S.Ct. 70, 93 L.Ed.2d 27 (1986). *Cooper Union* and other decisions issued by this Court do suggest that, in the analogous context of reviewing a finding by the National Labor Relations Board, "[w]here the Administrative Law Judge's findings are basic or evidentiary and hinge upon credibility determinations, the substantiality of the evidence to support inconsistent findings by the Board is more open to question than it otherwise might be." *Local 259, United Automobile Aerospace and Agricultural Implement Workers of America v. NLRB,* 776 F.2d 23, 27 (2d Cir.1985); *see also Ewing v. NLRB,* 732 F.2d 1117, 1121 (2d Cir.1984). This authority, however, is irrelevant to the present appeal. Here, the Secretary made both factual and legal findings consistent with those made by the ALJ. As the discussion below makes clear, moreover, we rely solely upon the explicit credibility findings of the ALJ, to whom we must

show special deference, *Local 259,* 776 F.2d at 27, and not on any additional credibility findings that the Secretary might arguably have made.[6]

## The Requirements of the "Because" Clause

■ Petitioner contends that in order for a driver's refusal to qualify as a protected activity under the "because" clause of the STAA, a post-incident inspection of the tractor must reveal objective evidence of an unsafe condition. This position is indefensible in light of the text of § 405(b) of the STAA, as well as the legislative history of the Act.

Yellow Freight identifies a passage in the Congressional Record on the STAA, which states that "the bill is designed to assure that employers are provided protection from unjustified refusal by their employees to perform legitimate assigned tasks," 128 Cong. Rec. 32510 (1982), to support its interpretation of the "because" clause. Without the requirement that the existence of an actual safety defect be proven, petitioner contends, the "because" clause fails to effectuate this Congressional policy goal. We disagree.

While protecting trucking firms from unjustified work refusals certainly was clearly of concern to Congress in passing the STAA, other overriding policy concerns also motivated its enactment. More precisely, Congress sought to combat the "increasing number of deaths, injuries, and property damage" resulting from vehicle accidents in the interstate trucking industry. 128 Cong.Rec. 32509, 32510 (1982) (remarks of Sen. Danforth and summary of proposed statute). In addition, noncompliance with safety regulations in the transportation industry had become so common that Congress recognized the need "to assure that employees are not forced to drive unsafe vehicles or commit unsafe acts," and to "provide protection for those employees who are discharged or discriminated against for exercising their rights

---

6. Petitioner points to only one such potentially new credibility finding by the Secretary, namely, his decision to "accord ... little weight" to Yellow Freight's evidence, based on the testimony of Yellow Freight mechanic Chuck Pastor that nothing was found to be wrong with the tractor, Final

Decision at 5. In deciding upon the weight to accord the results of the post-trip inspection, we do not show deference to any credibility determination inherent in this particular finding by the Secretary.

and responsibilities." 128 Cong.Rec. 29192 (1982). *See also Brock v. Roadway Express, Inc.,* 481 U.S. 252, 262, 107 S.Ct. 1740, 1747–48, 95 L.Ed.2d 239 (1987). For this latter purpose, Congress included Section 405 in the STAA. *Id.*

The Secretary's interpretation of the "because" clause, namely that an employee need not prove the existence of an actual safety defect in order for his or her refusal to receive protection, comports with both the text and the aforementioned purposes of § 405. As noted *supra* at 5, the "because" clause applies where an employee refuses to drive "because of the employee's reasonable apprehension of serious injury to himself or the public due to the unsafe condition" of the truck. 49 U.S.C.App. § 2305(b). Significantly, Congress added that "[t]he unsafe conditions causing employee's apprehension of injury must be of such nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a bona fide danger of an accident, injury, or serious impairment of health, resulting from the unsafe condition." *Id.* Thus, under the "because" clause, Congress mandated that the objective reasonableness of the employee's perception that an unsafe condition existed be evaluated in light of the situation that confronted the employee at the time. By contrast, Petitioner's interpretation demands that we focus solely upon the results of the post-incident inspection in analyzing Thom's refusal to drive on March 30.

Examination of the Secretary's interpretation of the "when" clause further supports his interpretation of the "because" clause. The Secretary has consistently required a complainant to prove that a truck was actually unsafe when he or she seeks protection under the "when" clause.[7]

The leading Department of Labor cases of *Robinson* and *Brame,* relied upon by both Petitioner and Respondent, are consistent with the Secretary's interpretation of the "because" clause, although they concededly

do not compel it. In *Brame,* a driver refused to drive a truck because he was not satisfied with the working condition of the brakes. *Brame,* at 1. Subsequent to the driver's initial complaint, "the brakes were tested and found safe by a mechanic and a number of other experienced drivers, and although Complainant was informed of these results, he still refused to drive." *Id.* at 2 (internal citations omitted). The Secretary affirmed the finding of the ALJ that the "because" clause provided the driver no protection under these facts because "Complainant's apprehension was unreasonable." *Id.* The facts of *Brame.* differ from the circumstances here, specifically in that, unlike Brame, Thom was not confronted with evidence of a mechanical evaluation immediately prior to his refusal to drive. *Brame* simply does not resolve the ultimate question in this action, namely, whether the "because" clause of § 405(a) permits the Secretary to find that a complainant's belief was objectively reasonable when the employee was ordered to proceed with his task before his complaint had been investigated and when a post-incident inspection of the vehicle fails to reveal an actual safety defect. Nor does *Robinson* dispose of this issue. In that action, the Secretary analyzed the evidence surrounding the refusal of the employee to drive because of weather conditions and concluded that the weather at the time of the refusal was unsafe in fact; therefore, the employee's perception of an "unsafe condition" was objectively reasonable. It is undisputed that the "because" clause protects behavior to which the "when" clause applies—that is, refusal to drive when an actual safety defect is found. The disputed issue on this appeal is whether the "because" clause provides broader protection than does the "when" clause. We hold that it does.

We note, moreover, that to interpret the "because" clause as requiring proof of an actual safety defect would render the language of the "because" clause superfluous, a consequence which it is axiomatic that we avoid. *See, e.g., Crandon v. United States,*

---

7. *See, e.g., Brame v. Consolidated Freightways,* No. 90–STA–20, slip op. at 3 (Sec'y Dec. June 17, 1992) (complainant receives no protection under "when" clause unless safety assessment is cor-

rect); *Robinson v. Duff Truck Line, Inc.,* No. 86–STA–3, slip op. at 12 (Sec'y Dec. March 6, 1987) (reasonable belief that unsafe condition exists fails to implicate the "when" clause).

494 U.S. 152, 171, 110 S.Ct. 997, 1008, 108 L.Ed.2d 132 (1990) (Scalia, J., concurring) ("It is an ancient and sound rule of construction that each word in a statute should, if possible, be given effect. An interpretation that needlessly renders some words superfluous is suspect."). Accordingly, while the results of a post-incident mechanical inspection are certainly probative of the circumstances that confronted an employee at the time of the refusal, we hold that there may exist circumstances in which an analysis of the situation encountered by a driver at the time of his or her refusal to drive would compel the conclusion that the driver's perception of an unsafe condition was "reasonable" under the "because" clause, despite the fact that a subsequent mechanical inspection revealed no actual safety defect. We now turn to the issue of whether we confront such a set of facts on this appeal.

### Whether Thom's Belief Was Objectively Reasonable

■ Two factors compel affirmance of the Secretary's finding that Thom's perception of an unsafe condition on the night of March 30 was objectively reasonable. First, an experienced over the road driver, Thom, noticed that Unit 76380 was exhibiting a lack of power [8] and attributed this behavior to a fuel problem.[9] Pross and Lombardo both testified that they believed Thom to have been sincere and truthful in his report of his perceptions at the time he called Yellow Freight on March 30. Second, Mr. Mergenhagen, the driver who replaced Thom on March 30, stated that he had difficulty "getting [Unit 76380] up to speed" and reported additional symptoms consistent with a fuel problem (i.e., smoke pouring out of the tractor's exhaust pipe), and in fact refused to take responsibility for the tractor if he completed the trip. Thus, substantial evidence in the

record supports the Secretary's finding that Thom's belief that an "unsafe condition" existed on the night of March 30, in light of the circumstances confronting him at that time, was objectively reasonable.

### The "Communication Requirement" of § 405(b)

■ Petitioner contends, in the alternative, that even if Thom's perception of an unsafe condition was objectively reasonable, § 405(b) does not protect his refusal to drive on March 30 because he did not demonstrate below that he "sought from [Yellow Freight], and [was] unable to obtain, correction of the unsafe condition." 49 U.S.C.App. § 2305(b) (the "communication requirement"). Petitioner further argues that Mr. Pross's response to Thom's report discharged Yellow Freight's obligations under § 405(b). Both contentions are meritless.

It is undisputed on this appeal that Thom informed Yellow Freight that Unit 76380 was exhibiting a lack of power, manifested by a capacity to achieve a speed of not more than 50 mph on a slight decline, 45 mph on flat stretches of road, and 35 mph on a slight incline. Thom also hypothesized to Mr. Pross that the loss of power might be the result of a "fuel problem." Petitioner asserts that this notification was insufficient to satisfy the communication requirement imposed by § 405(b) because: (1) The general mention of a lack of power does not indicate to Yellow Freight the nature of the "unsafe condition" an employee claims to exist; and (2) Thom's failure to communicate to Yellow Freight the "unsafe condition" upon which the Secretary anchored his findings, namely, the danger of being rear-ended, losing control, or "throwing" a trailer that might arise if the lack of power in the tractor had continued until Thom reached a rutted section of I–290.[10] We disagree.

8. Yellow Freight has sought to characterize Pross's interpretation of Thom's complaint as related to Thom's general dissatisfaction with city tractors. Pross's own version of their exchange on the night of March 30 contradicts this argument. Pross testified that at the time he spoke with Thom, he understood Thom to be complaining about a lack of power relative to other city units in the particular tractor Thom

was driving that evening, rather than the ability of city tractors generally.

9. We address whether a problem in the fuel and power plant system of a tractor constitutes an "unsafe condition" *infra* at 85.

10. The Secretary noted that:
[T]he tractor's inability to maintain speed created a hazard on an interstate highway where

With respect to the first argument, the ALJ found, and the Secretary concurred, that a "description of the problem as a loss of power jeopardizing the tractor's ability to climb the hills that lie ahead would be sufficient to alert Respondent that the tractor had a mechanical problem which could affect the safety of the driver and the public." ALJ Dec. 13. We find substantial evidence in the record to support such a finding. Not only did the ALJ credit Thom's testimony that he informed Yellow Freight that he believed a fuel problem was causing the power loss, *id.* at 12–13, a determination which is entitled to substantial deference, *see supra* at 11, but Yellow Freight's own witnesses (mechanic Veihdoffer and maintenance manager Kray) confirmed that a complaint of a lack of power in a tractor is understood at Yellow Freight to indicate a power plant and fuel system problem. Furthermore, the record contains testimony of mechanic Veihdoffer that in the two weeks prior to March 30, he had received periodic write-ups for no power in Unit 76380 and, in response, had installed two new fuel filters during that period. Finally, the ALJ credited, and the Secretary cited, the testimony of King regarding his previous experience of power loss in Unit 76380. FD & O at 4. Thus, we hold that Thom's report to Mr. Swistak and Mr. Pross on the night of March 30 was sufficiently detailed to notify Yellow Freight of the mechanical problem that he feared was causing an "unsafe condition" in the tractor.

As to Yellow Freight's latter contention, the potential safety hazard posed by a defect in the power plant and fuel system is self-evident, and Yellow Freight has in fact never disputed this. Accordingly, we find unpersuasive Yellow Freight's argument that Thom's complaint did not adequately apprise Yellow Freight of the nature of the "unsafe condition" in question because Thom failed to

state that loss of power due to a power plant and fuel system problem could cause him to be rear-ended, lose control of the tractor, or confront unsafe wiggling of the trailers. It strains credulity to believe that in balancing the needs of public and driver safety against the interest of trucking firms in avoiding bad faith work refusals [11] Congress intended to require a driver to catalog for his employer every potential disaster that might arise as a consequence of a perceived mechanical problem in order to satisfy § 405(b). Yellow Freight, and other trucking firms, are expected to employ mechanics, dispatchers, and supervisors who understand the trucking business, including the possible consequences of mechanical malfunctions. Where, as here, a driver identified a potential mechanical problem (lack of power due to a "fuel problem") as well as one dire consequence that could derive from that problem (i.e., an inability to pull hills), the Secretary was justified in ruling that the communication requirement of § 405(b) had been satisfied and that the Act imposed upon the employer an obligation to make reasonable efforts to ascertain the safety implications of the information given in order to correct the unsafe condition or otherwise allay the complainant's fears.

Yellow Freight contends that Pross' response to Thom's complaint of no power, namely, instructing Thom "when you encounter one of these hills, if the tractor doesn't pull these hills, contact us, more or less we'll cross that bridge when we come to it," was reasonable and therefore discharged the obligations that § 405(b) imposed on Yellow Freight. We cannot agree. First, as noted *supra* at 80, the ALJ and Secretary found, based on undisputed evidence, that a tractor lacking adequate power due to a fuel problem is subject to rear-ending, loss of control by the driver, or throwing a trailer, regardless

the flow of traffic was 55–65 mph and where 'ruts' had been imposed during highway resurfacing, and that Thom reasonably apprehended serious injury due to the unsafe condition.... Numerous drivers testified that the condition could result in their being rear-ended, losing control or 'throwing' a trailer.
FD & O at 5.

**11.** *See LeBlanc v. Fogleman Truck Lines,* No. 89–STA–8, 3–6 OALJ Dec. 64, 67 (Sec'y Dec. Dec.

20, 1989) (the requirement under § 405(a) that a complainant communicate the safety defect to an employer "serves to permit timely correction of the problem, thus promoting safety, to permit the employer to allay worker fears if the hazard is nonexistent, and to reduce bad faith work refusals"), *aff'd sub nom. Fogleman Truck Lines v. Dole,* 931 F.2d 890 (5th Cir.1991) (Table).

of whether the tractor is engaged in ascending travel. Pross' response thus entirely ignored the risks Thom and the public faced as Unit 76380 traversed even flat roads. Second, the suggestion that Thom confront the problem of ascending travel by actually attempting to climb the upcoming hills is manifestly unreasonable given the danger that a truck experiencing a lack of power will be unable to back up to get off the hill. The foregoing risks militate against endorsing Yellow Freight's conduct on the night of March 30 in addressing Thom's complaint. Accordingly, we find that Pross' response did not correct the "unsafe condition" that Thom had adequately communicated to Yellow Freight, as § 405(b) requires.

### The Secretary's Allocation of the Burden of Proof

█ Petitioner argues that the Secretary's FD & O fails to comply with the guidelines set forth in the controlling authority for evidentiary burdens of proof in STAA retaliation cases, *St. Mary's Honor Center v. Hicks,* 509 U.S. ——, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Petitioner's reliance on *Hicks* is misplaced. *Hicks* simply reiterates that in a discrimination case, the ultimate burden of proof remains at all times with the plaintiff to demonstrate that illegal discrimination actually motivated the defendant to take an adverse employment action against the plaintiff. *Id.* at ——, 113 S.Ct. at 2753; *see also Saulpaugh v. Monroe Community Hosp.,* 4 F.3d 134, 142 (2d Cir.1993) ("We read *Hicks* as doing no more than reiterating the long-standing rule that despite shifting burdens of production, a plaintiff always shoulders the ultimate burden of proof.... [T]he trier of fact must find that the plaintiff has proven its explanation of discriminatory intent by a fair preponderance of the evidence."), *cert. denied,* —— U.S. ——, 114 S.Ct. 1189, 127 L.Ed.2d 539 (1994). The Secretary made exactly such a finding, concluding that Thom had sustained his burden of proof by demonstrating that his belief that an "unsafe condition" existed was objectively reasonable, that Thom adequately communicated the complaint to Yellow Freight, and that Yellow Freight had discharged him because of his refusal. Our review of the record reveals substantial evidence to affirm the Secretary's conclusion. For the reasons set forth *supra* at 78–85, Thom's refusal to drive on the night of March 30 was protected under § 405(b). Mr. Lombardo acknowledged, moreover, that Yellow Freight would not have fired Thom but for this refusal to drive—a protected activity. Accordingly, *Hicks,* which requires no more than that a fact-finder make an affirmative finding of a prohibited motivation, *see* n. 12 *supra,* has been satisfied.

While Yellow Freight contends that such a finding will impose an intolerable burden on trucking firms, leaving them defenseless against unjustified work refusals, we believe that this conclusion strikes the balance sought by Congress in the STAA between driver and public safety and the needs of transportation employers. We do not here suggest that the results of a post-incident inspection are irrelevant to an analysis of liability under the "because" clause. Rather, we simply adhere to the Congressional mandate embodied in § 405(b) that, when a trucking firm determines whether to discipline an employee who has refused to drive because of a perceived safety concern, the firm must balance *all* factors relevant under the "because" clause, including *inter alia* the nature of the "unsafe condition" alleged and the seriousness of its possible consequences for driver or public safety, the mechanical symptoms that the driver and others on the scene witnessed, and the safety history of the particular vehicle involved. In the case of Mr. Thom, Yellow Freight simply did not properly balance these considerations, instead relying solely upon the post-incident mechanical inspection.

Accordingly, for all of the foregoing reasons, we find that Thom's refusal to drive on March 30 constituted activity protected by the "because" clause of the STAA, and that Yellow Freight discharged him as a result of his engagement in this protected activity.

### CONCLUSION

The judgment of the Secretary is affirmed.