89 F.3d 826
 NOTICE: THIS SUMMARY ORDER MAY NOT BE CITED AS PRECEDENTIAL AUTHORITY, BUT MAY BE CALLED TO THE ATTENTION OF THE COURT IN A SUBSEQUENT STAGE OF THIS CASE, IN A RELATED CASE, OR IN ANY CASE FOR PURPOSES OF COLLATERAL ESTOPPEL OR RES JUDICATA. SEE SECOND CIRCUIT RULE 0.23.
J.L.C. INDUSTRIES, INC., Petitioner,
v.
THE SECRETARY OF THE UNITED STATES DEPARTMENT OF LABOR and
Dee Kerrick, Respondents.
 No. 95-4040.
 United States Court of Appeals, Second Circuit.
 Dec. 1, 1995.
 
 APPEARING FOR PETITIONER:H. TODD BULLARD, Rochester, NY.
 APPEARING FOR RESPONDENTS:EDWARD O. FALKOWSKI, United States Department of Labor, Washington, DC.
 Before VAN GRAAFEILAND, JACOBS and PARKER, Circuit Judges.
 
 SUMMARY ORDER
 
 1
 ON CONSIDERATION WHEREOF, IT IS HEREBY ORDERED, ADJUDGED AND DECREED that the Decision and Order of the Secretary of Labor is AFFIRMED.
 
 
 2
 Petitioner J.L.C. Industries, Inc. ("JLC") appeals the Secretary of Labor's Decision and Order, which found that JLC violated 49 U.S.C. app. § 2305 (1988), the employee protection provision of the Surface Transportation Assistance Act of 1982.[1] The scope of our review of an agency decision is limited: "We will only consider whether the [Secretary] made any errors of law and whether the [administrative law judge's] findings of fact, in light of the entire record, are supported by substantial evidence." Crawford v. Director, OWCP, 932 F.2d 152, 154 (2d Cir.1991); 5 U.S.C. § 706(2) (1988). Having carefully reviewed the entire record, we conclude that substantial evidence exists to support the ALJ's findings and that no errors of law were made.
 
 
 3
 JLC's business is delivering cargo by truck from its terminal in Rochester, New York. It rents and leases many of its tractors from DeCarolis Rent-a-Truck ("DeCarolis"), which has its office and lot one block from JLC's terminal.
 
 
 4
 Petitioner Dee Kerrick drove trucks for respondent from March 1992 to October 1992. On the morning of Saturday, October 3, Kerrick began his return trip to JLC's Rochester terminal from Monroe, Ohio, driving tractor number 2180. Later that day, Kerrick heard a loud noise from the tractor and noticed that exhaust fumes were leaking into the cab. The fumes forced Kerrick to drive with his windows open for the rest of the trip. When Kerrick stopped for the night on October 3, he slept without heat in the cab since he could not keep the engine running. Tractor 2180 was at this point in violation of Department of Transportation commercial motor vehicle safety regulations, which state that:
 
 
 5
 (e) The exhaust system of every truck and truck tractor shall discharge to the atmosphere at a location to the rear of the cab....
 
 
 6
 ...
 
 
 7
 (g) No part of the exhaust system shall leak or discharge at a point forward of or directly below the driver/sleeper compartment....
 
 
 8
 49 C.F.R. § 393.83(e), (g).
 
 
 9
 JLC maintains an 800 number for its drivers to call when repairs are needed. This number rings at the JLC dispatcher's office; when no one is in the office, the call goes unanswered. JLC is open from approximately 7:00 a.m. to 7:00 p.m. Monday through Friday, and is closed part of Saturday and all day Sunday. Kerrick claims that he was only instructed to call this 800 number in the event of a breakdown. JLC claims it instructs its drivers to page their supervisors or to call them collect at home in the event of off-hour problems, and to call a 24-hour 800 number at DeCarolis when they need off-hour repairs. The DeCarolis office closes at 4:00 p.m. on Saturday and is closed on Sunday. JLC claims that the DeCarolis 800 number is answered even when the DeCarolis office is closed.
 
 
 10
 Kerrick arrived at the JLC terminal in Rochester at 2:00 p.m. on Sunday, October 4. No one was in the office. Kerrick claims that he filled out a "driver's vehicle inspection report" stating that the tractor had an exhaust leak, left one copy of the report in the cab, and left two copies in the JLC mailbox. Kerrick then went home. JLC claims it never received the report.
 
 
 11
 The next morning, Monday, October 5, Kerrick called to inform his dispatcher, Joe DeBrock, about the exhaust leak. DeBrock told Kerrick that he was scheduled to drive tractor 2180 again that evening to Canton, Michigan, with the delivery due in Canton at 7:00 Tuesday morning. According to Kerrick, DeBrock promised him that the exhaust leak would be fixed. JLC denies this.
 
 
 12
 Kerrick arrived at the JLC terminal in the evening of October 5 to begin his trip. When he started tractor 2180, he noticed that the exhaust fumes were still leaking into the cab. He turned off the truck and drove his car to DeCarolis, where he asked the DeCarolis employee on duty whether a repair order for tractor 2180 had been received. It had not. The employee suggested that Kerrick fill out a repair order. Kerrick did. Apparently, Kerrick did not request that his truck be repaired immediately or that he be given a replacement vehicle, and the DeCarolis employee offered neither option. Kerrick then went home.
 
 
 13
 On Tuesday, October 6, DeBrock called Kerrick at 7:00 a.m. and asked him why he had not driven the truck to Canton. Kerrick responded by asking DeBrock why he had not fixed the truck. DeBrock hung up. At 7:30 a.m., DeBrock called back and fired Kerrick. One hour later, DeBrock brought tractor 2180 to DeCarolis, where an exhaust leak was fixed. Kerrick filed this complaint with the Occupational Safety and Health Administration (OSHA) the same day.
 
 
 14
 Administrative Law Judge (ALJ) Thomas M. Burke found, and the Secretary of Labor affirmed, that JLC violated the two prohibitions of § 2305(b), which are referenced as the "when clause" and the "because clause":
 
 
 15
 No person shall discharge, discipline, or in any manner discriminate against an employee with respect to the employee's compensation, terms, conditions, or privileges of employment for refusing to operate a vehicle when such operation constitutes a violation of any Federal rules, regulations, standards, or orders applicable to commercial motor vehicle safety or health ["when clause"], or because of the employee's reasonable apprehension of serious injury to himself or the public due to the unsafe condition of such equipment ["because clause"]. The unsafe conditions causing the employee's apprehension of injury must be of such nature that a reasonable person, under the circumstances then confronting the employee, would conclude that there is a bona fide danger of an accident, injury, or serious impairment of health, resulting from the unsafe condition. In order to qualify for protection under this subsection, the employee must have sought from his employer, and have been unable to obtain, correction of the unsafe condition.
 
 
 16
 49 U.S.C. app. § 2305(b) (emphasis added). The ALJ found that JLC violated the "when clause" because the operation of tractor 2180 on the evening of October 5 would have violated a federal commercial motor vehicle safety regulation, see 49 C.F.R. § 393.83(e), (g), supra, and that JLC violated the "because clause" because Kerrick had a reasonable apprehension on the evening of October 5 that operating tractor 2180 would cause him or the public serious harm.
 
 
 17
 JLC makes two arguments in opposition to the ALJ's findings. First, it argues that Kerrick did not make the requisite showing of a causal link between Kerrick's refusal to operate tractor 2180 and his dismissal. JLC claims that Kerrick's discharge was occasioned not (in the words of the statute) by his "refus[al] to operate a vehicle" under the stated circumstances, but by his irresponsibility in refusing to deliver the cargo to Canton, Michigan when he knew that it needed to arrive by 7:00 the next morning. According to JLC, Kerrick took inadequate steps to fix the truck, get a replacement, or notify his supervisors of the delay. The ALJ found, however, that the steps taken by Kerrick were sufficient, and substantial evidence supports that finding.
 
 
 18
 The ALJ credited Kerrick's testimony that he filled out a vehicle repair report upon arriving at the JLC terminal on the evening of October 4, that he left a copy of the report in his truck, that he left two copies in the JLC mailbox, that he phoned his dispatcher on the morning of October 5 to notify him of the exhaust leak personally, and that the dispatcher promised him that the problem would be fixed. JLC's denials notwithstanding, substantial evidence supports the ALJ's finding that Kerrick prepared and left the report, and that he advised his dispatcher by telephone.
 
 
 19
 The ALJ also found that Kerrick took the initiative to drive to DeCarolis on the evening of October 5 to check on the problem, and that he filled out a second repair report there. JLC argues that Kerrick should have insisted that the truck be repaired immediately, demanded a replacement truck, or called the dispatcher or company president at home. JLC's business manager testified, however, that JLC drivers needed to contact their supervisors before requesting a replacement vehicle. Since the JLC office was closed when Kerrick picked up tractor 2180 on the evening of October 5, he would have had to call his supervisors at home which, the ALJ found, was not standard company policy. Perhaps Kerrick might have insisted that DeCarolis fix his truck on the spot, but it is not clear that Kerrick had the authority to demand the repairs. In short, (a) substantial evidence supports the ALJ's finding that Kerrick "adequately followed [JLC's] required procedures" in attempting to get his truck repaired, and (b) it was not arbitrary, capricious, or an abuse of discretion for the ALJ to conclude that Kerrick was fired "for refusing to operate" tractor 2180.
 
 
 20
 JLC's second argument is that Kerrick cannot claim the protection of § 2305(b) because under the statute, he "must have sought from his employer, and have been unable to obtain, correction of the unsafe condition." JLC argues that Kerrick did not adequately "seek to correct" the truck's exhaust leak.
 
 
 21
 The statutory limitation that the employee "seek to correct" the unsafe condition applies only to the statute's "because clause," and not to the "when clause." A review of § 2305(b) confirms that all the language following the "because clause" refers only to that clause. The sentence that immediately follows the "because clause" concerns the "unsafe conditions causing the employee's reasonable apprehension of injury," an unmistakable reference to the "unsafe condition" term used in the "because clause." That sentence also ends with another reference to "the unsafe condition." The third sentence, which contains the "seek to correct" clause, also refers to "the unsafe condition," another clear reference to the "because clause." See Yellow Freight Systems, Inc. v. Reich (Thom), 38 F.3d 76, 77 n. 1 (2d Cir.1994) (noting that the "seek to correct" limitation qualifies the "because clause"); 49 U.S.C. § 31105 (1995 Supp.) (Congress's 1994 "non-substantive" reorganization of § 2305(b), explicitly linking the "seek to correct" limitation with the "because clause" and not with the "when clause"). The Secretary of Labor adds a policy reason for this reading of the statute: the "because clause" affords broader protection to employees than the "when clause," so it makes sense to offset the potentially sweeping "because clause" with a measure of protection for employers.
 
 
 22
 The ALJ's finding of a "when clause" violation is therefore unaffected by JLC's argument that Kerrick failed to satisfy the "seek to correct" clause. It is uncontested that tractor 2180 was in violation of a federal commercial motor vehicle safety regulation on the evening of October 5, and we may uphold the Secretary's decision on the "when clause" violation alone.
 
 
 23
 Substantial evidence supports the ALJ's finding of a "because clause" violation as well. We discussed above the evidence that supports the ALJ's finding that Kerrick took sufficient steps to get tractor 2180 repaired. The same evidence supports a finding that Kerrick did seek "from his employer, and [was] unable to obtain, correction of the unsafe condition."
 
 
 24
 Our decision is supported by our prior decision in Yellow Freight. In that case, the driver embarked on a trip hauling cargo from his company's terminal in Buffalo, N.Y. to Rochester, N.Y. Four miles from the terminal, the driver pulled off the highway because he sensed that the truck did not have enough power to make it up the highway's approaching inclines. When he called his dispatcher about the problem, the dispatcher ordered him to continue. He refused, and the company fired him over the phone. The driver left his truck off the highway, and the company sent a new driver to complete the trip. Though the new driver also complained about a lack of power, the truck completed the trip without incident. 38 F.3d at 78-79. We held that there was substantial evidence to support the Secretary of Labor's decision in favor of the driver. Id. at 85. Unlike the driver in Yellow Freight, Kerrick continued to drive his faulty truck on October 3 and 4 and did not leave the truck by the side of the highway. He also took steps to advise JLC in time for repairs to be done well in advance of his next trip. In light of Yellow Freight, we conclude that there is substantial evidence to support the Secretary's decision that JLC violated § 2305(b).
 
 
 25
 We therefore affirm.
 
 
 
 [1]
 In 1994, Congress renumbered and reorganized § 2305. P.L. 103-272, 108 Stat. 745, 990. On July 5, 1994, the date of enactment, 49 U.S.C. § 31105 became the controlling statute for claims of the kind disputed here. Since the events at issue in this case took place in 1992, § 2305 controls